<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>COOL, COOL, WATER LLC,<br><br>                  Debtor. | Case No.:   05-24666 (DHS)<br><br>Adv. No.:   05-02318 (DHS)<br><br>Judge:     Donald H. Steckroth, U.S.B.J. |
| COOL, COOL, WATER LLC,<br><br>                  Plaintiff,<br><br>v.<br><br>BLACKSTONE CAPITAL PARTNERS LP,<br><br>                  Defendant. | |

**FILED**

JAMES J. WALDRON, CLERK

**APRIL 3, 2007**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ Ronnie Plasner, DEPUTY

<u>**OPINION**</u>

**APPEARANCES:**

Duane Morris LLP
David H. Stein, Esq.
Joseph H. Lemkin, Esq.
744 Broad Street, Suite 1200
Newark, New Jersey 07102
***Attorneys for Palomar Mountain Spring Water, Inc.,
and Attorneys in fact for Donald V. Biase,
Chapter 7 Trustee of Cool, Cool, Water LLC***

Duane Morris LLP
Christopher Celentino, Esq.
Donald F. Ennis, Esq.
101 West Broadway, Suite 900
San Diego, California 92101
***Attorneys for Palomar Mountain Spring Water, Inc.,
and Attorneys in fact for Donald V. Biase,
Chapter 7 Trustee of Cool, Cool, Water LLC***

Peretore & Peretore PC
Frank Peretore, Esq.
191 Woodport Road
Sparta, New Jersey 07871
***Attorneys for Blackstone Capital Partners LP***

<u>**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**</u>

Before the Court are competing motions for summary judgment.  First, Palomar Mountain

Spring Water, Inc. (hereinafter "Palomar"), as attorney-in-fact for Donald V. Biase, the Chapter 7

Trustee (hereinafter "Trustee") for Cool, Cool, Water LLC (hereinafter "CCW" or "Debtor"), and

Plaintiff in this adversary proceeding, filed a motion for summary judgment.  In response,

Blackstone Capital Partners LP (hereinafter "Blackstone"), the Defendant in this adversary

proceeding, filed a cross-motion for summary judgment.  Both parties subsequently filed reply

briefs.  Both motions are made pursuant to Federal Rule of Bankruptcy Procedure 7056.  For the

reasons that follow, Palomar's motion for summary judgment is granted in part and denied in part,

and Blackstone's cross-motion for summary judgment is granted in part and denied in part.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing

Order of Reference from the United States District Court for the District of New Jersey dated

July 23, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (K).

Venue is proper under 28 U.S.C. §§ 1408 and 1409.  The following shall constitute the Court's

findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.


<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

On August 15, 2003, Palomar filed a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California, Case

No. 03-07604.  (*Declaration of Donald F. Ennis, Esq. in Support of Palomar Mountain Spring*

*Water, Inc.'s Motion for Summary Judgment*, ¶ 3) (hereinafter "*Ennis Decl.*").[1]  On January 6, 2004,

---

[1] Blackstone makes several objections to the declaration of Donald Ennis, Esq., discussed herein.  As a result of

the United States Bankruptcy Court for the Southern District of California entered an order authorizing Palomar to sell assets, consisting of certain bottling equipment, as well as assume and assign leases to National Beverage Marketing Group LLC (hereinafter "NBMG"). (*Id.* at ¶ 4). Mr. Ennis asserts that the sale to NBMG was to be "free and clear of any liens and interests, for a purchase price of $750,000, $250,000 of which was to be paid in cash at closing, with the $500,000 balance to be paid over two years from [the] closing [date] pursuant to the terms of a promissory note." (*Id.*).

NBMG initially failed to satisfy the conditions of closing, but subsequently notified Palomar of its ability to close the transaction through an assignment of rights to CCW. (*Id.* at ¶¶ 5-6). CCW was to receive financing for the transaction from Blackstone. (*Id.* at ¶ 6). On May 10, 2004, Palomar, NBMG, CCW and Blackstone executed an assignment of NBMG's rights to CCW and Blackstone. (*Id.* at ¶ 7). Blackstone is a licensed California Finance Lender and claims to be exempt from any claim of usury. (*Affidavit of Brad Quigley in Support of Blackstone's Opposition to Palomar's Motion for Summary Judgment and in Support of Blackstone's Cross-Motion for Summary Judgment*, ¶ 3, Exhibit 1) (hereinafter "*Quigley Aff.*"). On August 11, 2004, the parties entered into the Commercial Lease Agreement that is the principal subject of this adversary proceeding.

Mr. Quigley, in his role as Managing Partner of Blackstone, was contacted by Richard Perkins, a financial broker employed by Perkins Financial Services, Inc., on behalf Stanley Phillips of CCW. (*Id.* at ¶ 4). Mr. Perkins proposed an agreement in which Blackstone would finance the

---

numerous paragraphs being stricken from the declaration, the following statement of facts shall consist of: (i) the remaining portions of Mr. Ennis's declaration, (ii) facts disputed by Blackstone as set forth in its cross-motion, and (iii) all relevant and admissible undisputed facts. Each motion for summary judgment shall be analyzed in the light most favorable to the non-moving party.

purchase of bottling equipment from the Palomar bankruptcy estate. (*Id.* at Exhibit 2). In determining whether to extend credit, Blackstone "generally does not concern itself with the creditworthiness of the customer, but rather the assets' auction value." (*Id.* at ¶ 5). However, Blackstone does price the proposed transaction to include the perceived risk of default. (*Id.*). This particular transaction posed a great risk of default to Blackstone as: (i) Mr. Phillips had terrible credit; (ii) Mr. Phillips had recently filed for bankruptcy; (iii) the only collateral for the transaction was the equipment itself; (iv) CCW had no revenue, hard assets, or profits; (v) Mr. Phillips had no working capital to operate the equipment or pay employees and suppliers; and (vi) the proposed guarantors[2] offered little financial security. (*Id.*).

Based upon the appraisal value of the equipment, Blackstone gave conditional credit approval to Mr. Phillips on behalf of Universal Group Multinational Corp. (hereinafter "Universal Group").[3] (*Id.* at ¶ 6, Exhibit 4). In turn, Mr. Perkins issued his conditional approval of the transaction to Mr. Phillips on April 9, 2004. (*Affidavit of Richard Perkins in Support of Blackstone's Opposition to Palomar's Motion for Summary Judgment and in Support of Blackstone's Cross-Motion for Summary Judgment*, ¶ 6, Exhibit 3) (hereinafter "*Perkins Aff.*"). Mr. Quigley alleges that in June of 2004 the transaction had changed, with CCW and S&P Water Company LLC (hereinafter "S&P Water"), now acting as co-lessees. (*Quigley Aff.*, ¶ 8). Mr. Quigley attaches to his declaration a series of emails representing discussions of the proposed terms

---

[2] It can only be assumed that the proposed guarantors include Bernard D'Andrea and Stanley Phillips as these individuals are listed as the personal guarantors on the amended agreement at issue. (*Commercial Lease Agreement*).

[3] Mr. Quigley states that he was unsure as to whether the entity "purchasing" the equipment would be CCW or S&P Water Company, LLC, two companies owned by Mr. Phillips, or Universal Group, a company owned by Mr. D'Andrea. (*Quigley Aff.*, ¶ 6). Confusingly, he states that he approved the credit of Mr. Phillips on behalf of Universal Group. (*Id.*). However, the conditional approval attached to Mr. Quigley's affidavit identifies the lessee as Universal Group with a contact listed as Mr. D'Andrea. (*Id.* at Exhibit 3). Mr. Phillips is not mentioned in the statement of conditional approval. (*Id.*). In a letter dated April 9, 2004, Mr. Perkins issued a conditional approval to Messrs.

of the agreement in an effort to prove the involvement of Robert Ferb, Esq., who allegedly incorporated CCW as well as S&P Water and acted as counsel to Mr. Phillips during negotiation of the Commercial Lease Agreement.  (*Id.* at ¶ 9, Exhibit 6).  These emails evidence Mr. Ferb's involvement as early as August 9, 2004.  On that date, Mr. Ferb sent an email to, *inter alios*, Donald Ennis, Brad Quigley, and Stanley Phillips in which he states that he reviewed the changes to the "assignment and assumption agreement" with Mr. Philips and that "they are ok." (*Id.*).  This email was generated after a conversation earlier that day, in which Mr. Perkins explained the materials terms of the agreement to Messrs. Phillips and Ferb.  (*Perkins Aff.*, ¶ 8).  In addition, Mr. Ferb admits to his involvement as early as "spring of 2004," after being engaged by Mr. Phillips on behalf of CCW.  (*Affidavit of Robert J. Ferb, Esq. in Support of Palomar's Reply to Blackstone's Opposition to Palomar's Motion for Summary Judgment and in Opposition to Blackstone's Cross-Motion for Summary Judgment*, ¶ 4) (hereinafter "*Ferb Aff.*").

Mr. Quigley forwarded the proposed agreement, which was drafted as a lease without a purchase option, to Mr. Phillips in June of 2004.  (*Quigley Aff.*, ¶ 10).  In mid-June of 2004, Mr. Quigley claims to have participated in a conference call with Messrs. Phillips and Ferb, in which Mr. Ferb explained that Mr. Phillips did not want to undertake the financing without owning the equipment.  (*Id.* at ¶ 11).  Mr. Ferb allegedly stated that for the transaction to go forward, it would have to be converted to a "lease intended as a security" with a $1 purchase option.  (*Id.*).  Mr. Quigley agreed, had his attorney draft an amendment to the agreement, and forwarded it to Mr. Ferb. (*Id.* at Exhibit 7).

---

D'Andrea and Phillips, also naming the lessee as Universal Group.  (*Id.* at Exhibit 5).

Mr. Quigley states that in conference calls with CCW regarding the transaction, Mr. Ferb, as attorney for CCW and Mr. Phillips, did not permit Messrs. Quigley and Phillips to speak directly except as to "ministerial functions." (*Id.* at ¶ 12). "In every conference call of any consequence about the transaction, Mr. Ferb was included and was on the line discussing the various components of the transaction with me (Mr. Quigley). . . ." (*Id.*). On or about July 14, 2004, Mr. Phillips executed the (i) Commercial Lease Agreement, (ii) Amendment to Lease Agreement, and (iii) Equipment Purchase Option on behalf of CCW and S&P Water.[4] (*Commercial Lease Agreement*). Messrs. D'Andrea and Phillips are alleged personal guarantors of the Commercial Lease Agreement. On the same day, Blackstone filed a UCC-1 financing statement evidencing a prospective interest in the assets. (*Declaration of Brad Quigley in Support of Blackstone's Motion for Relief from the Automatic Stay in Palomar's Bankruptcy Proceeding*, ¶ 8, *Ennis Decl.*, Exhibit B) (hereinafter "*Quigley Decl. in Motion for Relief*").

In contest, Mr. Ferb states that his involvement was limited to review of the proposed agreements and that he "had no role in the negotiations between CCW and Blackstone regarding the Blackstone funding which took place prior to approximately mid-May 2004." (*Ferb Aff.*, ¶¶ 5-6). Instead, his significant role involved negotiation of an assumption and assignment agreement between CCW, Palomar and a third-party entity. (*Id.* at ¶ 7). Mr. Ferb notes that the emails attached to Mr. Quigley's affidavit relate to the assumption and assignment agreement with the third-party entity, and not to the negotiations for the funding of the Commercial Lease Agreement. (*Id.*). As to paragraphs nine through thirteen of Mr. Quigley's affidavit on this motion, Mr. Ferb states: (i) that he never limited contact between Mr. Quigley and CCW or its principal; (ii) he did not participate in

---

[4] The Agreement identifies Blackstone as Lessor, and CCW as well as S&P Water as co-Lessees.

a conference call in which he negotiated the $1.00 purchase option to the Commercial Lease Agreement; and (iii) that he never spoke to Mr. Quigley to negotiate the same. (*Id.* at ¶ 8). Instead, Mr. Ferb states that his only substantive involvement in the negotiation of the Commercial Lease Agreement was a review of the documents in June of 2004 and his "determin[ation] that there was a fair market buyout rather than a $1.00 buyout. . . ." (*Id.*).

Mr. Quigley signed the Commercial Lease Agreement on behalf of Blackstone August 11, 2004. (*Commercial Lease Agreement*). The Amendment to Lease Agreement states that "[t]his lease is hereby amended to reflect that this lease is not a true lease, but instead is a lease intended as security." (*Id.*). The Equipment Purchase Option states that "Lessor hereby agrees that the Lessee above has the option, but not the obligation, to purchase the above leased equipment at the end of the lease term for the following amount, plus applicable taxes and fees, if any. Purchase Option Of: $1.00." (*Id.*).

Concurrently, CCW executed a promissory note with a face value of $600,000 in favor of Palomar, secured by various collateral then owned or thereafter acquired. (*Ennis Decl.*, ¶ 18; *Certification of Donald Ennis , Esq. in Support of Palomar's Cross-Motion to Vacate the Automatic Stay in CCW's Bankruptcy Proceeding*, ¶ 14 (claming the promissory note had a value of $600,000, with $150,000 payable in trade credits); *Quigley Decl. in Motion for Relief*, ¶¶ 15-16 (claiming the promissory note bears a face value of only $450,000)). Messrs. Phillips and D'Andrea are also personal guarantors of this commitment. (*Ennis Decl.*, ¶ 18). The note represented the non-cash portion of the purchase price, which CCW could not pay at the time of sale. (*Id.*). Palomar perfected its security interest by filing UCC-1 financing statements in various locations. (*Id.* at ¶ 20). Palomar's lien on the assets at issue was consensually subordinated to that of Blackstone. (*Id.*).

–8–

It is undisputed that CCW borrowed money from Blackstone in order to facilitate the purchase of Palomar's assets. (*Memorandum of Law of Palomar Mountain Spring Water, Inc. in Support of its Motion for Summary Judgment*, p. 15) (hereinafter "*Palomar Br.*"); (*Blackstone's Counter-Statement of Facts in Opposition to Palomar's Motion for Summary Judgment*, ¶ 2) (hereinafter "*Blackstone's Facts*").

The final amount advanced by Blackstone to CCW, or to third parties on behalf of CCW, amounted to either $350,000 or $410,619.79. (*Palomar Br.*, p. 8). Palomar contends that Blackstone only advanced $350,000. (*Id.*). Blackstone submits that it made net disbursements of $410,619.79 to fund the purchase of assets. (*Blackstone's Responses to Palomar's First Set of Interrogatories*, pp. 2-3, *Quigley Aff.*, Exhibit 1). The total payments to be made under the Commercial Lease Agreement amounted to $780,842.42,[5] excluding applicable taxes.

Mr. Ennis describes the transaction as a sale of assets from Blackstone to CCW, attended by the simultaneous creation of a "security interest in the assets as collateral for the secured financing Blackstone had given to CCW." (*Ennis Decl.*, ¶ 9). At oral argument, the parties agreed that the Commercial Lease Agreement is a secured transaction. (*Oral Argument on Motions for Summary Judgment*). According to counsel for CCW, "Blackstone's understanding at the time it agreed to the one dollar purchase option, as acknowledged in the addendum to the Agreement, was that the inclusion of such a provision converted the Agreement into a non-lease under which Blackstone would not own the assets subject thereto." (*Palomar Br.*, p. 18). Blackstone disputes this interpretation, noting that the inclusion of the purchase option converted an otherwise true lease into a lease intended as security. (*Blackstone Facts*, ¶ 9).

---

[5] The Commercial Lease Agreement contains a thirty-six month Payment Schedule as follows: (i) Payment 1,

CCW subsequently defaulted on its obligations to both Palomar and Blackstone, and on May 3, 2005, filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey.  On July 21, 2005, CCW filed an adversary complaint against Blackstone.  CCW states the following in its complaint: "[Blackstone] contends that it is the owner of [the] equipment and [CCW] believes by virtue of the financing agreement that [CCW] is the owner of equipment subject to claims of Blackstone Capital Partners LP." (*Complaint*, ¶ 8).  Thus, the complaint asks this Court to determine that Blackstone is a secured creditor and that the equipment in Schedule A to the Commercial Lease Agreement belongs to CCW.  (*Id.* at ¶ 10).  CCW is unable to determine the amount owed to Blackstone and seeks to compel Blackstone to prove the extent and validity of its lien.  (*Id.* at ¶ 11).

CCW made payments to Blackstone totaling $217,922.85.  (*Blackstone's Responses to Palomar's First Set of Interrogatories*, pp. 4-5, *Quigley Aff.*, Exhibit 2; *Quigley Decl. in Motion for Relief*, ¶ 9).  On November 18 and 22, 2005, this Court granted Palomar and Blackstone relief from the automatic stay, respectively, and permitted each to pursue its claims against the water bottling equipment at issue.

On February 24, 2006, this Court approved the Trustee's sale of the vast majority of the assets to Nationwide Beverage Bottling, Inc. in the amount of $1,375,000, with all valid liens attaching to the proceeds of sale.  This Court further Ordered that Palomar holds a valid second lien and security interest in the assets in the amount of $790,685.49, plus accrued interest, costs and attorneys' fees.  Finally, this Court Ordered that Palomar be paid $200,000 and the Trustee be paid

---

$20,000 (advance payment), (ii) Payments 2-3, $15,000, and (iii) Payments 4-36, $22,146.74.  (*Commercial Lease Agreement*).  The total payment amount of $780,842.42 is a simple calculation of these figures.

$50,000 from Palomar's secured claim on the assets.  On May 15, 2006, this Court entered a similar Order authorizing distribution of $250,000 from the sale proceeds to Blackstone.

In a letter dated March 8, 2006, the Trustee made a tender offer of $450,000 to Blackstone in what the Trustee purports to be full satisfaction of all obligations under the Commercial Lease Agreement under California law and Federal Rule of Civil Procedure 68.  (*Ennis Decl.*, ¶ 32, Exhibit A).  Blackstone rejected the offer by permitting it to expire.  As of April 7, 2006, Blackstone alleged an outstanding balance of $909,941.32, which increased to over $1,000,000 as of the oral argument before this Court.  A summary of Blackstone's expenses is as follows:

| | |
|---|---:|
| Delinquent Payments (13 payments) | $289,560.29 |
| Delinquent Property Tax | $3,850.39 |
| Delinquent Sales Tax | $24,029.18 |
| Delinquent Insurance[6] | $8,470.00 |
| Late Charges | $210,890.30 |
| Bond | $500.00 |
| Future Payments of $354,347.84 discounted by 6% | $333,086.96 |
| Future Sales Tax of $27,461.92 discounted by 6% | $25,814.20 |
| Security Guard | $13,740.00 |
| **Total** | **$909,941.32** |

(*Quigley Aff.*, ¶ 15, Exhibit 11).

---

[6] At some undefined point in time, it is alleged that CCW failed to provide required insurance coverage for the equipment and that Blackstone was required to force place same.  (*Quigley Decl. in Motion for Relief*, ¶ 9).

## <u>LEGAL ARGUMENTS ADVANCED BY THE PARTIES</u>

The gravamen of the arguments raised by Palomar, as attorney-in-fact for the Trustee, in support of its motion for summary judgment is that the Commercial Lease Agreement executed by the parties is a loan transaction accompanied by a security interest in favor of Blackstone, rather than a lease. (*Palomar Br.*, pp. 27-28). As such, Palomar requests that this Court construe an implied amount of principal and interest as well as apply Article 9 of the California Uniform Commercial Code. (*Id.* at 28, 35, 38-39). From this conclusion, Palomar avers that "the provisions of the UCC and [the] California Civil Code governing true leases are wholly inapplicable to Blackstone's transaction with CCW, and Blackstone is only entitled to avail itself of the remedies governing commercial loan transactions." (*Id.* at 33).

Blackstone agrees that Article 9 of the California Uniform Commercial Code may be applied to the Commercial Lease Agreement as it constitutes a secured transaction. (*Blackstone's Memorandum of Law in Opposition to Palomar's Motion for Summary Judgment and in Support of Blackstone's Cross-Motion for Summary Judgment*, pp. 17, 21) (hereinafter "*Blackstone's Br.*"). However, Blackstone argues that the agreement is a lease intended as a security and that Article 9 remedies can be enforced collectively with the remedies provided by the agreement. (*Id.*).

Palomar argues that it is entitled to summary judgment on the following ten issues:

1.   Blackstone's Agreement with CCW is not a true lease, but rather is a financing agreement, documenting a loan by Blackstone to CCW.

2.   Blackstone is not entitled to recover unearned, unaccrued interest after the date (March 8, 2006) it was tendered the full amount then-owed under the Agreement. The remedy Blackstone seeks (future payments) is only available to lessors following a lessee's default under a true lease.

–12–

3.      Blackstone is not entitled to recover an unconscionable rate of interest on the monies it loaned CCW.

4.      Blackstone is not entitled to recover any late charges under the Agreement, given that the late charge provision, which constitutes a liquidated damages provision, was not negotiated between Blackstone and CCW, and was not narrowly tailored as an estimate of the damages Blackstone would likely incur in the event CCW made late payments.

5.      Even if Blackstone were entitled to enforce the late charge provision of the Agreement, Blackstone may not recover multiple late charges for a single late payment.

6.      Blackstone is not entitled to recover attorneys' fees which are unreasonable, and for which it has refused to submit any evidence to determine their reasonableness.

7.      Blackstone is not entitled to recover future taxes, or taxes which it has not paid and is not liable for.

8.      Blackstone is not entitled to recover insurance payments allegedly made to 'force place' an insurance policy, when it has refused to produce evidence of the actual policy.

9.      The amount of Blackstone's claim is no greater than the $450,000, which the Trustee tendered to Blackstone on March 8, 2006, with the exact amount of Blackstone's claim to be fixed at trial.

10.     Palomar and CCW, upon this Court's determination that one or both of them are the prevailing party in this dispute with Blackstone over the Agreement, are entitled to recover their respective attorneys' fees and costs from Blackstone under the attorneys' fees provision of the Agreement, which is made reciprocal under California Civil Code section 1717.

(*Palomar Br.*, pp. 3-4) (citation omitted).  This Court now turns to its conclusions of law.

## DISCUSSION

**A. Summary Judgment Standard**

A court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The court must construe facts and inferences in a light most favorable to the non-moving party. *See Am. Marine Rail NJ, LLC v. City of Bayonne*, 289 F. Supp. 2d 569, 578 (D.N.J. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). "Only evidence admissible at trial may be used to test a summary judgment motion. Thus evidence whose foundation is deficient must be excluded from consideration." *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989) (citations omitted).

The moving party must make an initial showing that there is no genuine issue of material fact. *See Knauss*, 289 F. Supp. 2d at 549 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the non-moving party to "'make a showing sufficient to establish the existence of [every] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Cardenas v. Massey*, 269 F.3d 251, 254-55 (3d Cir. 2001) (questioned on other grounds) (quoting *Celotex Corp.*, 477 U.S. at 322). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

–14–

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*,

477 U.S. at 247-48 (emphasis in original).  An issue of fact is "genuine" if a reasonable juror could

return a verdict for the non-moving party.  *See id.* at 248.  Furthermore, a material fact is determined

by the substantive law at issue.  *See Crane v. Yurick*, 287 F. Supp. 2d 553, 556 (D.N.J. 2003) (citing

*Anderson*, 477 U.S. at 248).  A fact is "material" if it might affect the outcome of the suit under

governing law.  *Id.*  Disputes over irrelevant or unnecessary facts are insufficient to defeat a motion

for summary judgment.  *Anderson*, 477 U.S. at 248 (citation omitted).

However, even if material facts remain disputed, summary judgment may be proper if, after

all inferences are drawn in the non-moving party's favor, the moving party is entitled to judgment as

a matter of law.  *Id.* at 248-50.  Such a judgment is appropriate "as a matter of law" when the non-

moving party has failed to make an adequate showing on an essential element of his or her case, as

to which he or she has the burden of proof.  *See Celotex Corp.*, 477 U.S. at 322-23.  When one party

motions the court for summary judgment, Federal Rules of Civil Procedure 54(c) and 56, taken

together, permit the court to enter summary judgment on behalf of the non-movant, even if the non-

movant has not filed a cross-motion for summary judgment.  *See Peiffer v. Lebanon School Dist.*,

673 F. Supp. 147, 151-*52 (M.D. Pa. 1987) (citation omitted).  On the other hand, a court must deny

a motion for summary judgment when a genuine issue of material fact remains to be tried, or where

the moving party is not entitled to a judgment as a matter of law.

**B. Admissibility of the Declaration of Donald F. Ennis, Esq.**

On March 27, 2006, Blackstone filed an objection to the declaration of Donald F. Ennis,

Esq., counsel for Palomar, based upon Federal Rules of Evidence 402, 408, 602 and 802.  In order to

consider the declaration of Donald Ennis, Esq. on the instant motions for summary judgment, this

Court must first determine its admissibility.  *See Williams*, 891 F.2d at 471 (citations omitted).

Blackstone's objection states:

> 1.    [Blackstone] objects to the Declaration of Don Ennis, as a whole, on the grounds that Mr. Ennis is not a percipient witness and has not been identified as having knowledge of the facts of this lawsuit in Plaintiff's discovery.  [Blackstone] requests that if the Court considers the Declaration, that the Court order that Mr. Ennis appear for his deposition in the State of New Jersey.
>
> 2.    [Blackstone] objects to the Declaration of Don Ennis ¶¶ 1 through 10 and 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 40, 42, and 43 on the grounds of relevancy to the issues set forth in the pending Motion[s] in this Adversary Action.
>
> 3.    [Blackstone] objects to the Declaration of Don Ennis ¶¶ 11, 15, 16, 25, 26, 27, 36, 37, 38, 39, 40, 42, and 43 on the grounds of hearsay.
>
> 4.    [Blackstone] objects to the Declaration of Don Ennis [¶¶ 32-34 as a privileged document containing an offer of settlement.

*Blackstone's Objection to the Declaration of Don Ennis*, p. 2.

As a threshold issue, this Court must first determine if Blackstone's objection to the

declaration of Donald Ennis, Esq. is procedurally proper.

> Materials submitted by a party in connection with a summary judgment motion may be challenged on grounds that would preclude consideration of the material for the purposes of the motion. The vehicle to make this type of contention is a motion to strike. In order for the court to consider a motion to strike, the moving party must be specific in its request, directing the court to the particular submission the party wants stricken and setting forth the reasons for the court to take such action. *A party is not required to make a formal motion to strike exhibits that do not conform to Rule 56(e) in order to remove documents from a court's consideration of a summary judgment motion. All that is required is a timely objection that sets forth the ground for the objection.*

11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, § 56.14[4][a] at 56-197 through 56-198 (3d ed. 2004) (footnotes omitted) (emphasis added) (hereinafter "MOORE'S FEDERAL PRACTICE").

This Court will treat the declaration as a supporting document or exhibit, because its sole purpose is to provide facts necessary to support Palomar's motion and legal argument. Donald Ennis, Esq. clearly recognizes this when he states that "[t]his Declaration is filed *in support of* Palomar's Motion for Partial Summary Judgment. . . ." *Ennis Decl.*, ¶ 2 (emphasis added). The declaration is optional and permits a party to include facts in its legal argument that are not already part of the record before this Court. There is no Rule 56 requirement that affidavits be used in a motion for summary judgment. *See* FED R. CIV. P. 56(a) ("A party seeking to recover upon a claim . . . may . . . move with or without supporting affidavits for a summary judgment in the party's favor . . . ."); *see Celotex Corp.*, 477 U.S. at 323-26.

A necessary corollary of this decision is that Blackstone was not required to file a formal motion to strike in order to object to the declaration of Donald Ennis, Esq. Blackstone's objection was not opposed as untimely. In addition, it specifies a basis for each objection and each paragraph objected to. Moreover, "[a] court may, in its discretion, strike out portions or the entirety of

–17–

affidavits, interrogatories, and other submissions which are not competent, even if a motion to strike

has not been made."  11 MOORE'S FEDERAL PRACTICE, § 56.14[4][b] at 56-199; *see Williams*, 891

F.2d at 471 (citations omitted).  This Court will consider Blackstone's objections to the declaration

of Donald Ennis, Esq.


**Objections on the Basis of Relevance**

"'Relevant evidence' means evidence having any tendency to make the existence of any fact

that is of consequence to the determination of the action more or less probable than it would be

without the evidence."  FED. R. EVID. 401; *see McKoy v. N.C.*, 494 U.S. 433, 440 (1990) (quoting

*N.J. v. T.L.O.*, 469 U.S. 325, 345 (1985) (quoting FED. R. EVID. 401)); *Hurley v. Atlantic City Police

Dept.*, 174 F.3d 95, 109 (3d Cir. 1999) (quoting FED. R. EVID. 401).  "All relevant evidence is

admissible. . . .  Evidence which is not relevant is not admissible."  FED. R. EVID. 402; *see Old Chief

v. U.S.*, 519 U.S. 172, 178-79 n.3 (1997) (quoting FED. R. EVID. 402); *U.S. v. Moore*, 375 F.3d 259,

263-64 (3d Cir. 2004) (citing FED. R. EVID. 402) (other citations omitted).  In the instant motion,

Blackstone objects to the Declaration of Donald F. Ennis, Esq., on the basis of relevancy with regard

to paragraphs "1 through 10 and 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 40, 42

and 43. . . ."  *Blackstone's Objection to the Declaration of Don Ennis*, ¶ 2.

The allegedly objectionable portions of Mr. Ennis's declaration begin by stating that he is the

counsel of record for Palomar and that his declaration is in support of Palomar's motion for

summary judgment.  *Ennis Decl.*, ¶¶ 1, 2.  He then describes Palomar's filing a voluntary petition for

relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of

California, an order of that court permitting Palomar to sell assets as well as assume and assign

leases, and NBMG's original attempt to close the transaction. *Id.* at ¶¶ 3-5. In paragraphs six through ten, Mr. Ennis informs this Court of the amendments to the original agreement, in which Blackstone loaned money to CCW to pay the cash portion of the sale and CCW executed a promissory note for the balance of the purchase price. *Id.* at ¶¶ 6-10. He then describes the second amendment to the asset purchase agreement, including reasons for the amendment, the structure of the transaction as amended, and Palomar's purported filings of UCC-1 statements as well as perfection of a security interest in the bottling equipment as collateral. *Id.* at ¶¶ 17-20.

After describing the executed transaction, Mr. Ennis alludes to CCW's default on the promissory note and its subsequent filing of a voluntary petition for relief under Chapter 11 of the Bankrutpcy Code. *Id.* at ¶¶ 21-22. In paragraphs twenty-three and twenty-four, Mr. Ennis refers to two Orders entered by this Court in CCW's global bankruptcy case. *Id.* at ¶¶ 23-24. The declaration continues by describing Blackstone's attempts to sell the bottling equipment after receiving relief from the automatic stay, its negotiations with Palomar to stipulate to the same, and Palomar's competing plan to sell the equipment to NBMG. *Id.* at ¶¶ 25-29. Mr. Ennis then describes the Trustee's application to sell the assets to NBMG, Ordered by this Court on February 24, 2006, and the Trustee's tender offer of settlement to Blackstone by letter dated March 8, 2006. *Id.* at ¶¶ 30-32. Finally, Mr. Ennis attaches documents relating to Palomar's previously granted motion for redemption and sale of the assets to NBMG, including: (i) a copy of Bernard D'Andrea's joinder to the motion; (ii) the declaration of Thomas Higgins in support of the motion; and (iii) the tentative ruling of the United States Bankruptcy Court for the Southern District of California on Blackstone's motion for relief from stay in Palomar's bankruptcy proceeding. *Id.* at ¶¶ 40, 42-43.

In its motion for partial summary judgment, Palomar presents this Court with ten issues that can be separated into three areas: (i) the legal status of the Commercial Lease Agreement between Blackstone and CCW; (ii) the construction of the terms of the agreement; and (iii) whether Blackstone is entitled to recover future rental payments, attorneys' fees, taxes, and insurance payments. Based upon the subject of Mr. Ennis's declaration and the issues presented for summary judgment, this Court believes that all paragraphs objected to, with the exception of paragraph forty-three, are relevant to the instant motions for summary judgment.

The declaration provides the context, procedural history and facts necessary for decision on the issues presented in Palomar's motion for summary judgment. *See* FED. R. EVID. 401. For example, Mr. Ennis describes CCW's default on the promissory note and subsequent bankruptcy filing. This information is relevant to the motion for summary judgment because under the Uniform Commercial Code, default provides the non-breaching party with certain remedies. In addition, the fact that CCW filed a voluntary petition for bankruptcy is necessary as it provides the basis for jurisdiction and application of rules unique in the bankruptcy context to Palomar's motion for summary judgment. Paragraph forty-three is irrelevant to Palomar's motion for summary judgment, however, as the tentative ruling of another court does not affect the outcome of determinative issues here. This Court hereby strikes paragraph forty-three of Donald Ennis, Esq.'s declaration as irrelevant.

**Objections on the Basis of Personal Knowledge**

Blackstone objects to Mr. Ennis's declaration on the basis that Mr. Ennis is "not a percipient witness and has not been identified as having knowledge of the facts of this lawsuit in Plaintiff's discovery." *Blackstone's Objection to the Declaration of Don Ennis*, ¶ 1. Blackstone asks this Court to disregard the entire declaration of Donald Ennis, Esq., or in the alternative, require Mr. Ennis to appear for a deposition in the State of New Jersey.

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." FED. R. EVID. 602. In summary judgment motions, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e).

> Counsel may submit an affidavit in connection with a summary judgment motion so long as there is compliance with the general requirements applicable to all such affidavits. . . . Consequently, the practice of an attorney utilizing his affidavit as a vehicle through which other documents are offered in support of a litigant's position ordinarily is not acceptable for the summary judgment motion *unless the documents are already in the record, were created as part of the litigation (e.g. discovery materials), or relate to client representation or law firm matters on which the attorney is competent to testify*.

11 MOORE'S FEDERAL PRACTICE, § 56.14[1][c] at 56-161 (footnote omitted) (emphasis added).

In his certification, Mr. Ennis describes events relating to Palomar's bankruptcy filing and his representation of Palomar as a debtor-in-possession. *Ennis Decl.*, ¶¶ 1-3. During the course of

Palomar's case, the tri-party agreement for sale of the bottling equipment was negotiated, amended twice, and executed. *Id.* at ¶¶ 4-20. CCW then defaulted on the promissory note in favor of Palomar, and various parties sought relief from the stay to assert their rights in the bottling equipment that culminated in the sale of the equipment to NBMG. *Id.* at ¶¶ 21-31. The remaining paragraphs of Mr. Ennis's declaration, thirty-two through forty-two, describe the documents attached thereto, which include: (i) motions in Palomar's bankruptcy case, (ii) exhibits to motions in Palomar's bankruptcy case, (iii) documents produced in discovery, (iv) and deposition transcripts. *Id.* at ¶¶ 32-42.

Mr. Ennis relays these facts in the first person, describing his involvement in the case and transaction, including the alleged intent of the parties entering into the agreement. In addition, much of Mr. Ennis's declaration is incorporated into the record via his certification in support of Palomar's cross-motion for an order vacating the automatic stay in the Debtor's global bankruptcy proceeding. *See In re Cool Cool Water, LLC*, Case No. 05-24666 (DHS) (docket entry 47). Therefore, paragraphs one through forty-two of Donald Ennis, Esq.'s declaration consist of matters within his personal knowledge, to which he is competent to testify, and are admissible.

**Objections on the Basis of Hearsay**

Blackstone objects to portions of the Declaration of Donald Ennis, Esq., namely paragraphs 11, 15, 16, 25, 26, 27, 36, 37, 38, 39, 40, 42, and 43, on the grounds of hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). A statement is not hearsay if it consists of a prior statement of a witness, or it is an admission by a party opponent. *See* FED. R.

EVID. 801(d).  "Hearsay is not admissible except as provided by [the Federal Rules of Evidence] or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress."  FED. R. EVID. 802.

> To be acceptable at summary judgment stage, the evidence presented in the affidavit must be evidence that would be admissible if presented at trial through the testimony of the affiant as a sworn witness.  . . .  However, if an affidavit points to the testimony of another witness or source of competent evidence, this may demonstrate the existence of sufficient evidence available at trial to defeat the summary judgment motion.

11 MOORE'S FEDERAL PRACTICE, § 56.14[1][d] at 56-163 through 56-164 (footnotes omitted).

"A statement is not hearsay if -- [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity or . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. . . ."  FED. R. EVID. 801(d)(2).  An adverse party may use deposition of a person designated to testify.  *See* FED. R. CIV. P. 32(a).  A prerequisite to use is that the deponent served as officer, director, managing agent or was directed to testify at the time of deposition.  *Id.*

Admissions may be used to present a court with facts necessary to support a motion for summary judgment.  Answers to interrogatories may take the form of an admission for the purpose of summary judgment, as well as "[s]tatements made in open court on the record or other representations to the court, including admissions in correspondence. . . ."  11 MOORE'S FEDERAL PRACTICE, § 56.14[2][d][i] at 56-187 (footnote omitted).  In addition, admissions can consist of

statements made in response to deposition questions and those found in the record of other cases. *Id.* at § 56.14[2][d][iii] at 56-194.

Paragraphs eleven, fifteen, twenty-five, twenty-six, and twenty-seven of the declaration of Donald Ennis, Esq. describe conversations between Mr. Ennis and counsel for Blackstone regarding the negotiations of sale of the bottling equipment to NBMG and competing bidders. Paragraphs fifteen and sixteen, and paragraph twenty-seven reflect similar discussions between Palomar and CCW as well as Palomar and NBMG, respectively. Each paragraph discusses amendments to the sale agreement that could have been testified to by Mr. Ennis. However, each paragraph contains objectionable hearsay because the events described are prefaced by language including "Blackstone's Counsel and CCW . . . advised me" or "Blackstone's counsel further informed me. . . ." *Ennis Decl.*, ¶¶ 15, 26. No hearsay exception applies to the statements of NBMG as it is not a party to this proceeding and is not the agent or representative of a party. With regard to Blackstone and CCW, this Court is aware that, technically, these conversations meet the party admission requirements of Federal Rule of Evidence 801(d)(2). However, this Court must also consider the ramification of holding that these statements constitute admissions.

The relief requested by Blackstone in the event this Court considers the declaration is to require Donald Ennis, Esq. to appear for deposition in the State of New Jersey. Were the Court to permit Mr. Ennis to be deposed, Palomar would undoubtedly seek to depose Blackstone's counsel, Frank Peretore, Esq. This prospect presents possible conflicts for either counsel's continued representation of their respective clients, as it is well established that an attorney cannot act in the dual roles of counsel and necessary witness. At this juncture, the avoidance of such a predicament is relatively simple. The representative principals and employees of the parties as well as individual

–24–

signatories who personally negotiated the agreement are more than competent to testify at trial on all matters objected to here, which would preclude further complications such as the withdrawal of counsel at this late stage.  Therefore, this Court hereby strikes paragraphs eleven, fifteen, twenty-five, twenty-six, and twenty-seven of the declaration of Donald Ennis, Esq. as inadmissible.

In paragraph thirty-six, Mr. Ennis attaches the deposition transcript of Brad D. Quigley, taken in the Palomar bankruptcy case on January 31, 2006.  *Id.* at ¶ 36, Exhibit C.  To constitute non-hearsay, three requirements must be met for use of the deposition transcript of a designated corporate officer on a motion for summary judgment: (i) the deposition must be introduced by an adverse party; (ii) the person deposed must be an officer of the business entity; and (iii) the person deposed must continue to serve in their capacity as officer at the time of deposition.  *See* FED. R. CIV. P. 32.  A deposition taken in a totally unrelated judicial proceeding may be relied upon.  *See* 11 MOORE'S FEDERAL PRACTICE, § 56.14[2][d][iii] at 56-194.  Mr. Quigley was designated by Blackstone to testify at deposition in the Palomar bankruptcy proceeding.  *See Brad D. Quigley Deposition Transcript*, p. 29.  At the time of his deposition, Mr. Quigley was the "Managing Partner" and "Founder" of Blackstone.  *Id.* at 12, 18-19.  Therefore, Mr. Quigley's deposition transcript constitutes admissible evidence in support of Palomar's motion for summary judgment.

In paragraph thirty-seven, Mr. Ennis attaches exhibits used in the deposition of Mr. Quigley, produced by Blackstone in response to a request for production of documents.  *Ennis Decl.*, ¶ 37, Exhibit D.  As exhibits, these documents make up part of Mr. Quigley's deposition.  Separate and apart from Mr. Quigley's deposition, these documents represent ledger statements produced in discovery.  In both capacities, the documents labeled "BCP0003 through BCP0008" are admissible and will be considered.  *See* 11 MOORE'S FEDERAL PRACTICE, § 56.14[1][c] at 56-161.

In paragraph thirty-eight, Mr. Ennis attaches the declarations of Brad D. Quigley and Thomas E. McCurnin, filed in Palomar's bankruptcy case in support of Blackstone's opposition to an amended motion for redemption. *Ennis Decl.*, ¶ 38, Exhibit E. As part of the record in another judicial proceeding, the declarations are admissible here. *See* 11 MOORE'S FEDERAL PRACTICE, § 56.14[2][d][iii] at 56-194. In addition, the statements of both Messrs. Quigley and McCurrin were made as agents of Blackstone, and therefore constitute party admissions. *See* FED. R. EVID. 801(d)(2).

In paragraph thirty-nine to his declaration, Mr. Ennis attaches "Blackstone's Responses to Palomar's First Set of Interrogatories" in Palomar's bankruptcy proceeding. *Ennis Decl.*, ¶ 39, Exhibit F. The responses constitute part of the record in another judicial proceeding and are admissible.

In paragraph forty, Mr. Ennis attaches Bernard D'Andrea's joinder to Palomar's motion for redemption in Palomar's bankruptcy proceeding. *Id.* at ¶ 40, Exhibit G. Mr. D'Andrea's joinder is more than a simple statement of same. Instead, it contains one paragraph of factual assertions. Mr. D'Andrea's statements, as included in the declaration of Donald Ennis, Esq., constitute hearsay without an exception on the present motion for summary judgment as Mr. D'Andrea's statements are not offered by an adverse party and he is not alleged to be unavailable. However, these statements can be considered in reference to Palomar's motion for summary judgment because they constitute part of the record in another judicial proceeding.

As an attachment to his declaration at paragraph forty-two, Mr. Ennis exhibits the declaration of Thomas Higgins. *Ennis Decl.*, ¶ 42, Exhibit I. Mr. Higgins's declaration was submitted as an expert opinion of the balance outstanding under the promissory note at issue as of

December 29, 2005, in support of a motion to authorize the sale of collateral and redemption of a

senior secured claim in Palomar's bankruptcy proceeding. Palomar seeks to use Mr. Higgins's

declaration to support its motion for summary judgment. Mr. Higgins's declaration shall be

analyzed as an expert opinion because he lacks personal knowledge and because it is based on

scientific, technical, or specialized knowledge. *See* FED. R. CIV. P. 56(e) (personal knowledge

requirement); FED R. EVID. 701 (A lay opinion cannot include "scientific, technical, or other

specialized knowledge within the scope of Rule 702."); FED R. EVID. 702 (Experts are not required

to have personal knowledge as they testify as to items of "scientific, technical, or other specialized

knowledge [that] will assist the trier of fact. . . .").

Opinions of an expert must be in a form competent to be considered. *See* FED R. EVID. 702.

Even when an expert opinion is inadmissible in its submitted form, the opinion may still be

considered on a motion for summary judgment if it "reveals the ability to produce expert testimony

at trial. . . ." *Id.* Mr. Higgins's declaration includes his qualifications as a basis for giving expert

testimony, the necessary data for the analysis, his method of examination, and his detailed

computations.

Blackstone objects to Mr. Higgins qualifications as an expert, and to use of his declaration,

on various grounds. In reviewing Mr. Higgins's declaration, it is clear that the declaration does not

meet the requirements of an expert opinion and is therefore inadmissible. Blackstone states that it

does not "generally weigh creditworthiness of the customer but, rather the assets auction value" in

determining whether to extend credit. *Quigley Aff.*, ¶ 5. However, Blackstone states that it does

include the risk of default in its pricing. *Id.* As such, Blackstone analyzed the creditworthiness of

Mr. Phillips, took note of his recent bankruptcy filing, and realized that the only collateral was the

equipment as CCW had no assets, customers, profits, or working capital. *Id.* However, Mr. Higgins's analysis "focuses on financing the acquisition of equipment, based primarily on the value of the equipment" and specifically excludes factors such as "business credit history or credit profile," including that of its principal. *Declaration of Thomas Higgins*, ¶ 5, *Ennis Decl.*, Exhibit I.

Naturally, the poor credit rating of Mr. Phillips, and CCW's lack of assets, revenues, profits and working capital would contribute to a higher risk of default. Therefore, Mr. Higgins's opinion does not contain sufficient basis in fact or data, as it does not account for the creditworthiness of CCW or Mr. Phillips as factors relating to the risk of default on the transaction. *See* FED. R. EVID. 702. In addition, Mr. Higgins's testimony would not be admissible at trial, or its admissibility would be limited, for the same reasons. Consequently, this Court will not consider Mr. Higgins's declaration at this juncture.

**Objections on the Basis of Privilege**

In paragraphs thirty-two through thirty-four of his declaration, Mr. Ennis describes the calculation and transmission of a written offer, dated March 8, 2006, of $450,000 to Blackstone in "full satisfactions of all obligations owed" and in exchange for a release on all matters arising out of or relating to the tri-party agreement. *Ennis Decl.*, ¶¶ 32-34, Exhibit A. This letter sought to resolve the entirety of the instant adversary proceeding and expressly stated that it was made pursuant to Federal Rule of Civil Procedure 68, as incorporated by Federal Rule of Bankruptcy Procedure 7068, and Section 998 of the California Code of Civil Procedure. *Letter of Donald V. Biase*, *Ennis Decl.*, Exhibit A. In addition, the letter caption reads "Re: (I) Tender; and (II) Settlement Offer. . . ." *Id.*

As the Federal Rules of Evidence and Civil Procedure govern proceedings in federal court, they are

applied here.

> At any time more than 10 days before the trial begins, a party
> defending against a claim may serve upon the adverse party an offer
> to allow judgment to be taken against the defending party for the
> money or property or to the effect specified in the offer, with costs
> then accrued. If within 10 days after the service of the offer the
> adverse party serves written notice that the offer is accepted, either
> party may then file the offer and notice of acceptance together with
> proof of service thereof and thereupon the clerk shall enter the
> judgment. An offer not accepted shall be deemed withdrawn and
> evidence thereof is not admissible except in a proceeding to
> determine costs.

FED. R. CIV. P. 68.

> Evidence of the following is not admissible on behalf of any party,
> when offered to prove liability for, invalidity of, or amount of a claim
> that was disputed as to validity or amount, or to impeach through a
> prior inconsistent statement or contradiction:
>
> (1)   furnishing or offering or promising to furnish -- or accepting
>        or offering or promising to accept -- a valuable consideration
>        in compromising or attempting to compromise the claim; and
>
> (2)   conduct or statements made in compromise negotiations
>        regarding the claim, except when offered in a criminal case
>        and the negotiations related to a claim by a public office or
>        agency in the exercise of regulatory, investigative, or
>        enforcement authority.

FED. R. EVID. 408(a).

In his letter, Donald V. Biase expressly and impliedly references that the proposed payment

of $450,000 is made as a tender offer or an offer of settlement. The letter is inadmissible under

Federal Rule of Civil Procedure 68 as this is not a proceeding to determine costs and under Federal

Rule of Evidence 408(a) as it seeks to prove the amount of Blackstone's claim.


**C. Characterizing the Commercial Lease Agreement**

The threshold question is whether the agreement between the parties is a security agreement

or a lease.[7] "Whether a lease constitutes a security interest under the Bankruptcy Code depends

upon whether it constitutes a security interest under applicable state or local law." *Zions Credit*

*Corp. v. Rebel Rents, Inc.* (*In re Rebel Rents, Inc.*), 291 B.R. 520, 525 (Bankr. C.D. Cal. 2003)

(citations omitted). "Unless displaced by the particular provisions of this code, the principles of law

and equity, including the law . . . [of] bankruptcy, and other validating or invalidating cause shall

supplement its provisions." CAL. U. COM. CODE § 1103(b) (2007).

Section 1203 of the California Uniform Commercial Code reads in relevant part:

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and: . . .
>
> > (4)     the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

CAL. U. COM. CODE § 1203(b)(4) (2007). The California Court of Appeal is clear in its application

of this two-part test.

---

[7] By stipulation of the parties the agreement is governed by the laws of the State of California. *Commercial Lease Agreement*, ¶ 18.

Revised section 1201(37)(b)[8] initially instructs us, as before, to examine the facts of each case in characterizing a transaction. Yet this instruction is immediately qualified by the delineation of circumstances that create a security interest as a matter of law.

These circumstances are captured in a two-part test. *First, if the lessee does not have the right to cancel the purported lease prior to the expiration of its term, the parties will be considered to have entered into a security agreement.* If, on the other hand, the relationship is terminable by the lessee at any time, the instrument is a true lease.

*Second, at least one of the four enumerated conditions must be present.* If the lease term extends or may be renewed for the duration of the useful life of the product, *or if the lessee may acquire the product for little or no additional consideration, then the lessor is said to have agreed to forgo an economic interest in the goods at the end of the lease term. In such a case, the purported lease will be deemed to be a security agreement.* '[A]bsent a concern for the value or expectant return of the goods upon the conclusion of the lease term the lessor, at the inception of the lease, had really formulated no further anticipation of an investment return from the leased goods, an anticipation more historically associated with an intent to transfer a title interest in the goods. . . . Hence, the need for some form of security.'

*Addison v. Burnett*, 49 Cal. Rptr. 2d 132, 136 (Cal. Ct. App. 1996) (citation omitted) (emphasis added).

In this case, there is no language in the Agreement authorizing early termination by CCW. In fact, the Commercial Lease Agreement states that "[t]his is a non-cancelable lease, and shall be paid without abatement, reduction or set-off." *Commercial Lease Agreement*, ¶ 1. In addition, the Equipment Purchase Option provides that "Lessor hereby agrees that the Lessee above has the option, but not the obligation, to purchase the above leased equipment at the end of the lease term

---

[8] The substantive provisions of current California Uniform Commercial Code § 1203(b) (2007) have not substantively altered Section 1201(37)(b) since its effective date of January 1, 1990 or its application in *Addison*.

for the following amount, plus applicable taxes and fees if any.  Purchase Option Of: $1.00."

*Commercial Lease Agreement*.  Therefore, it is clear the Commercial Lease Agreement is a security

agreement governed by the California Uniform Commercial Code.  The impact of this decision is

that the water bottling equipment is the property of CCW and S&P Water under the Commercial

Lease Agreement, subject to the secured claims of Blackstone.

Article 9 of the California Uniform Commercial Code applies to "[a] transaction, regardless

of its form, that creates a security interest in personal property or fixtures by contract."  CAL. U.

COM. CODE § 9109(a)(1) (2007).  Here, the water bottling equipment at issue is certainly personal

property. In addition, the parties agree that Article 9 of the California Uniform Commercial Code

may be applied to this transaction.  *See Palomar Br.*, pp. 28, 35, 37-39 n.6; *Blackstone's Br.*, pp. 17,

21.

> After default, a secured party has the rights provided in this chapter and, except as otherwise provided in Section 9602, those rights provided by agreement of the parties. A secured party may do both of the following:
>
> > (1)     Reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure.
> >
> > (2)     If the collateral is documents, proceed either as to the documents or as to the goods they cover.

CAL. U. COM. CODE § 9601(a) (2007).

As did former Section 9-501, this Article leaves to the agreement of the parties the circumstances giving rise to a default. This Article does not determine whether a secured party's post-default conduct can constitute a waiver of default in the face of an agreement stating that such conduct shall not constitute a waiver. Rather, it continues to leave to the parties' agreement, as supplemented by law other than this Article, the determination whether a default has occurred or has been waived. *See* Section 1-103.

CAL. U. COM. CODE § 9601, Official Comment 3 (2007).

In addition to the express provisions of Article 9, two cases are instructive on whether Blackstone should be permitted to exercise its contract remedies in addition to the remedies provided by Article 9 of the California Uniform Commercial Code. In 1976, the Supreme Court of California decided *Puritan Leasing*, in which parties entered into a written lease agreement concerning restaurant kitchen equipment. *Puritan Leasing Co. v. August*, 546 P.2d 679, 681 (Cal. 1976) (superseded by CAL. CIV. CODE § 3308 (2007)). The lessees defaulted after six months on the eight-year term lease. *Id.* at 681. A provision in the lease permitted that upon default, the lessor could take possession of the equipment, sell it on the lessee's account, and recover immediately from the lessees any deficiency of the rent reserved. *Id.* After repossession and sale of the equipment, the lessor immediately brought an action to recover rent reserved plus incidental expenses, net of sale proceeds and amounts properly credited, discounted to present value. *Id.* Subsequent to jury trial, the trial court directed a verdict in favor of the lessor for unpaid rent up until the date of sale, plus insurance premiums and paid property taxes, minus the security deposit. *Id.* at 682.

The Supreme Court of California reversed and remanded, holding that the lease provision regarding repossession, sale and recovery of any deficiency based upon the total rent reserved was not an improper attempt to set liquidated damages. *Id.* at 686. Instead, recovery of any deficiency,

−33−

calculated by discounting the total rent reserved to present value was proper.  *Id.*  The Court began

by noting that under this clause, lessees can only be held liable for the excess deficiency over and

above resale proceeds.  *Id.* at 682.[9]  "[Lessor's] resort to its contractual remedy, accordingly, should

be upheld in the absence of some policy consideration invalidating it."  *Id.* at 683.  "Nor is the

[lessor] unjustly enriched by the remedy invoked here; he does not thereby obtain both the property

and the rent.  To the extent [lessor] disposes of the property, or obtains value for its use, [lessor]

must credit appropriately such sums received against amounts due from [lessees]."  *Id.* at 685.

Whether the theory under which the lessor proceeds for recovery is breach of the lease or

enforcement of the lease remedies expressly provided, the result is identical.  *Id.*

> This [modern chattel leasing transaction] therefore appears to have served a commercial function closely analogous to such other common financing methods as conditional sales and chattel mortgages.  The latter instruments as 'security interests' covered by division 9 of the California Uniform Commercial Code, do permit repossession and resale of the security and recovery of any deficiency. (CAL. U. COM. CODE §§ 9102, subd. (2), 9503, 9504, subd. (2); *see Kreisa v. Stoddard* 274 P.2d 164 (Cal. Ct. App. 1954)).  It has been suggested that a lease for the entire useful life of a chattel constitutes a 'lease intended as a security device' under California Uniform Commercial Code section 1201, subdivision (37), and is itself therefore a 'security interest' giving rise to the remedies provided in division 9. (3 CAL. COM. LAW (Cont. Ed. Bar 1966) §§ 1.5, 6.38, 9.52, pp. 6, 304, 482.)  *Under these circumstances, we fail to discern how application of the resale-and-deficiency clause in this lease is unfair to the [lessees].*

---

[9] This Court recognizes *Puritan Leasing's* warning that acceleration clauses are impermissible under personalty leases as liquidated damages.  *See Puritan Leasing*, 596 P.2d at 682.  However, and as discussed *infra*, the Commercial Lease Agreement is a conditional sales contract not subject to claims of mitigation.  In addition, as substantially all of the property has been sold from CCW's bankruptcy estate, Blackstone's cause of action is limited to money damages only.

> *Were we to decide as [lessees] would have us do in this case, the results would be manifestly inequitable. [Lessees] would have been permitted to repudiate a lease with impunity. [Lessor] would be left to recover what it could at a disadvantage and to absorb a substantial loss. Under the circumstances, we see no policy reason to foreclose to [lessor] a commercially reasonable remedy expressly agreed to by [lessees] in an arms-length transaction.*

*Puritan Leasing*, 546 P.2d at 686 (emphasis added).

The court in *Puritan Leasing* noted that traditionally, a lessor who seeks to recover from a defaulting lessee must wait until the end of the lease term or until the payment becomes due. *Id.* However, as the lessor had already repossessed and resold the equipment at issue, the lessor was permitted to continue suit as "nothing further [could] or need be done to ascertain the precise amount of loss sustained by the lessor." *Id.*[10]

---

[10] This singular aspect of *Puritan Leasing* has been superseded by statute. "[California] Civil Code section 3308 was enacted to give statutory authorization to lease provisions allowing the lessor to recover the worth at the time the lease was terminated of the amount of rent and charges equivalent to the rent reserved less the reasonable rental value for the balance of the term." *Newco Leasing, Inc. v. Hull*, 213 Cal. Rptr. 202, 203-04 (Cal. App. Dep't Super. Ct. 1985) (citing 3 WITKIN, SUMMARY OF CAL. LAW § 517, pp. 2188-89 (8th ed. 1973)).

> The parties to any lease of real or personal property may agree therein that if the lease shall be terminated by the lessor by reason of any breach thereof by the lessee, the lessor shall thereupon be entitled to recover from the lessee the worth at the time of the termination, of the excess, if any, of the amount of rent and charges equivalent to rent reserved in the lease for the balance of the stated term or any shorter period of time over the then reasonable rental value of the property for the same period.
>
> The rights of the lessor under the agreement shall be cumulative to all other rights or remedies now or hereafter given to the lessor by law or by the terms of the lease; provided, however, that the election of the lessor to exercise the remedy hereinabove permitted shall be binding upon him or her and exclude recourse thereafter to any other remedy for rental or charges equivalent to rental or damages for breach of the covenant to pay the rent or charges accruing subsequent to the time of the termination. The parties to the lease may further agree therein that unless the remedy provided by this section is exercised by the lessor within a specified time the right thereto shall be barred.

CAL. CIV. CODE § 3308 (2007). However, as discussed *infra*, the Commercial Lease Agreement constitutes a conditional sales contract and CAL. CIV. CODE § 3308 (2007) is inapplicable.

In 1978, the Ninth Circuit Court of Appeals decided *W W Leasing*, in which Torok Exploration, Mining and Construction Co. ordered a front-end loader from Sierra Machinery & Industrial. *W W Leasing Unlimited v. Torok Exploration, Mining & Construction Co., Inc.*, 575 F.2d 1259, 1260 (9th Cir. 1978). When Torok was unable to finance the purchase, Sierra agreed to lease the equipment to Torok for a period of six months with an option to purchase. *Id.* After eight months, Torok was again unable to finance the purchase. *Id.* In response, the parties agreed that Sierra would sell the equipment to W W Leasing, who would in turn lease it to Torok. *Id.* Simultaneously, Sierra and W W Leasing agreed that in the event of a default by Torok, Sierra would be able to repurchase the front-end loader. *Id.* To finance the purchase, W W Leasing executed a loan with Well Fargo, assigning the lease as security. *Id.* Torok defaulted after five months. *Id.* Upon selling the equipment to Sierra for the remaining balance of the Wells Fargo loan as agreed, W W Leasing brought suit against Torok for damages caused by the default. *Id.* The lease contained a default provision, inclusive of the substantive provisions provided in the Commercial Lease Agreement here. *Id.* at 1260-61.

The district court entered summary judgment for W W Leasing and awarded actual damages in the amount of: (i) the remaining monthly lease payments discounted to present value using a discount rate of 7.11%, (ii) a minimal late charge, (iii) plus a repossession fee, (iv) minus the resale price. *Id.* at 1261. On appeal to the Ninth Circuit Court of Appeals, Torok argued that its agreement with W W Leasing was a conditional sale, not a lease. *Id.*[11]

---

[11] A conditional sale is defined as "[a] sale in which the buyer gains immediate possession but the seller retains title until the buyer performs a condition, esp. payment of the full purchase price. See *retail installment contract* under CONTRACT." BLACK'S LAW DICTIONARY 1364 (8th ed. 2004) (emphasis in original). A retail installment contract is defined as "[a] contract for the sale of goods under which the buyer makes periodic payments and the seller retains title to or a security interest in the goods. – Also termed *retail installment contract and security agreement*; *conditional sales contract*." *Id.* at 348.

In response, the Ninth Circuit Court of Appeals stated: "[w]e find the distinction irrelevant in this case, because even if we determined the existence of a conditional sale agreement governed by the California [Uniform] Commercial Code, damages under the resale-and-deficiency clause would be the same." *Id.* (citing *see Puritan Leasing*, 546 P.2d at 685-86).

Here, based upon the express authority to enforce the agreed remedies in Section 9601 of the California Uniform Commercial Code and the evolution of case law in *Puritan Leasing* as well as *W W Leasing*, Blackstone is permitted to enforce the security agreement by the means provided in the agreement itself and Article 9 of the California Uniform Commercial Code. Assuming *arguendo* that the above cases only apply to the resale and deficiency clause within the remedies provision, this Court sees no persuasive reason why the principles set forth in *Puritan Leasing* and *W W Leasing* are not equally applicable to the instant remedies provision as a whole. This Court can find no provision that limits a right to anticipated payments under these circumstances and Palomar provides none. In addition, resale of the equipment at issue from a bankruptcy estate should not prejudice Blackstone's rights under commercial or contract law.

However, this general holding does not address the enforceability of any specific remedy in the security agreement at issue, such as the payment of future rent, amount of interest, late charges, insurance payments, or taxes. Instead, it decides only the threshold issue of application and expressly stops short of prejudicing any argument by CCW as to the specific unenforceability of any remedy in the Commercial Lease Agreement due to genuine issues of material fact and problems of proof, discussed *infra*.

**D. Future Rent Under the Commercial Lease Agreement**

In determining whether Blackstone is permitted to recover future rent upon default by CCW, discounted to present value at a rate of 6%, this Court again turns to Section 9601 of the California Uniform Commercial Code.  Section 9601 provides that upon default, and exclusive of exceptions inapplicable here, a secured party may utilize, in a cumulative manner, the remedies of Article 9 and the rights provided by agreement of the parties.  *See* CAL. U. COM. CODE §§ 9601(a-c) (2007); *see also U.S. v. Grayson*, 879 F.2d 620, 623 n.3 (9th Cir. 1989) ("We have interpreted [CAL. U. COM. CODE § 1208 (1964), now amended and renumbered as CAL. U. COM. CODE § 1309 (2007)] as also applying to clauses permitting acceleration of payments [in promissory notes] after the party has defaulted.") (citing *Brown v. Avemco Inv. Corp.*, 603 F.2d 1367, 1378-90 (9th Cir. 1979)); *compare* CAL. U. COM. CODE § 1208 (1964) *with* CAL. U. COM. CODE § 1309 (2007).

The remedies provision of the Commercial Lease Agreement provides that:

> [u]pon default, Lessor shall have the right to . . . (2) accelerate all sums payable under the Lease and any other agreements with Lessor or the Guarantor and require Lessee(s) or Guarantor to immediately pay Lessor all sums that are due, sums that may become due discounted at a rate of six percent (6%) as of the date of default, the fair market value of the Equipment, reduced to present value at [a] discount rate of six percent (6%) as of the date of default.  Such sums shall be due and payable upon notice of accelerations and demand for payment.  Lessor may institute legal proceeding against Lessee(s) and/or Guarantor to collect this sum; (3) Lessor shall have the right to exercise any other remedy at law or equity. . . .  The rights granted Lessor shall be cumulative.

*Commercial Lease Agreement*, ¶ 15.

The remedy of future payments discounted to present value is a direct correlation of actual damages to Blackstone and is readily calculated.  It cannot be contended that default followed by a

−38−

sale of goods to a third party could not result in damages to the original selling party, here Blackstone.

A party seeking to recover consequential damages under the California Uniform Commercial Code must prove their amount.  *See Carnation Co. v. Olivet Egg Ranch*, 229 Cal Rptr. 261, 266 (Cal. Ct. App. 1986) (Determined in the specific context of a seller's breach but creating a general rule and holding "that . . . the burden of proving the extent of loss incurred by way of consequential damages rests with the injured party. . . ."); *see also Hind v. Overseas Agencies, Ltd.*, 208 P. 110, 111 (Cal. 1922).  Here, Blackstone has calculated the net present value of future rental payments, using a 6% discount rate, to be $336,086.96.  *Quigley Aff.*, ¶ 15, Exhibit 11.  This calculation was not challenged and is clearly provided for in the Commercial Lease Agreement.  As of August 11, 2004, the date Blackstone executed the Commercial Lease Agreement, a risk-free investment in a United States Treasury Notes with a three-year maturity yielded 2.91%.  U.S. Treasury, *Daily Treasury Yield Curve Rates*, http://www.treas.gov/ offices/domestic-finance/debt-management/interest-rate/ yield_ historical_ 2004.shtml (last visited on April 2, 2007).  This does not account for risk of default, however.  It is undisputed that Blackstone took great risk in financing the purchase, at a time when CCW had little or no revenue and Mr. Phillips maintained a poor credit rating, taking only the equipment as collateral.  Under these conditions and the fact that the Commercial Lease Agreement was negotiated by the parties, the Court finds that the discount rate of 6% is commercially reasonable.

Upon default, a secured party may dispose of collateral in a commercially reasonable manner. *See* CAL. U. COM. CODE §§ 9610(a-b) (2007).  Upon disposition, the secured party shall credit sale proceeds to the outstanding balance.  *See* CAL. U. COM. CODE § 9615(a)(2) (2007).  An

obligor is liable for any deficiency on a security interest securing payment. *See* CAL. U. COM. CODE § 9608(a)(4) (2007). Here, the equipment was sold from the Debtor's bankruptcy estate. No party questions whether Blackstone constitutes a secured creditor. The outstanding balance due Blackstone, to be fixed at a later date, is a deficiency. Therefore, Blackstone is permitted to recover future rental payments, discounted to present value using a discount rate of 6%.


**E. Late Charges Under the Commercial Lease Agreement**

Palomar argues that Blackstone is not permitted to recover late charges under the Commercial Lease Agreement as they constitute an impermissible liquidated damages provision. However, Section 9601 of the California Uniform Commercial Code permits a secured party to exercise the remedies provisions of the security agreement in addition to those of Article 9. *See* CAL. U. COM. CODE, § 9601 (2007). Under controlling California law and with exceptions inapplicable here, a "provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." CAL. CIV. CODE § 1671(b) (2007).

In *Tycom Corp.*, the Ninth Circuit Court of Appeals had an opportunity to determine whether this presumption was overcome. *Tycom Corp. v. Bancboston Ventures, Inc.*, 1997 U.S. App. LEXIS 4610 (9th Cir. Mar. 10, 1997). The parties executed a commitment letter that required forfeiture of a $250,000 penalty to BancBoston if Tycom failed to go forward with financing for any reason. *Id.* at *1. Tycom elected not to execute a financing agreement when its principal shareholder would not agree to the terms of the proposed agreement. *Id.*

In upholding the $250,000 penalty, the Ninth Circuit Court of Appeals reasoned as follows.

> This obligation is neither unconscionable nor unreasonable. The
> agreement was negotiated at arms length by two sophisticated
> commercial parties; the liquidated damages provision was quite
> conspicuous and was revised several times before appellant signed
> the contract. *See Am. Software, Inc. v. Ali*, 54 Cal. Rptr. 2d 477, 480-
> 82 (Cal. Ct. App. 1996). Moreover, liquidated damages clauses are
> presumptively valid under California law unless the objecting party
> can prove 'the provision was unreasonable under the circumstances
> existing at the time the contract was made.' CAL. CIV. CODE § 1671.
> [Tycom] offers no evidence on this score. BancBoston Ventures
> spent considerable time trying to complete the transaction, and as a
> result, gave up opportunities to pursue other profitable investments.
> The amount agreed upon is a fair measure of this loss. *See Lowe v.
> Mass. Mut. Life Ins. Co.*, 127 Cal. Rptr. 23, 27-28 (Cal. Ct. App.
> 1976).

*Tycom*, 1997 U.S. App. LEXIS 4610 at *2.

Moreover, in *Lowe*, the California Court of Appeal encountered the identical issue now

presented to this Court. At issue is whether "'the person relying on a liquidated damage provision

has the burden of pleading and proving that *when the contract was entered into*, the fixing of

damages was impracticable or extremely difficult,'" *Lowe*, 127 Cal. Rptr. at 32 (emphasis in

original) (quoting *Chastain v. Belmont,* 271 P.2d 498, 506 (Cal. 1954); *see also Feiger v. Winchell,*

22 Cal. Rptr. 901, 906 (Cal. Ct. App. 1962)), or whether the amount must simply be reasonable in

light of "the losses the parties thought might be sustained," *Lowe,* 127 Cal. Rptr. at 34 (citations

omitted).

> 'The plaintiff's contention that the agreed amount did not represent
> an endeavor by the parties to estimate the probable damage is based
> on evidence that the liquidation clause was part of the printed
> material in a form contract generally used by the defendant in dealing
> with subscribers such as the plaintiff, and that the defendant did not

investigate the plaintiff's manner of conducting its business or the character and value of its stock. Nevertheless the parties agreed to the liquidation provisions, and there is no evidence that they were not fully aware of circumstances making it desirable that liquidated damages be provided for. . . . [para.] [It] is clear that the actual loss resulting from a breach could in many cases be less than the amount provided for. It is equally clear that in many other cases the actual loss would exceed that amount. To construe this as a penalty it would have to be said that the amount provided to be paid bore no reasonable relation to the losses the parties thought might be sustained. This may not rightly be stated.' *See also Atkinson v. Pacific Fire Extinguisher Co.,* 253 P.2d 18, 20-21 (Cal. 1953); *Feary v. Aaron Burglar Alarm, Inc.*, 108 Cal. Rptr. 242, 245-46 (Cal. Ct. App. 1973).

The principles last quoted are governing here. It was not necessary for the prospective lender to review all of its possible damages with the applicant. There is no evidence to show that the assignor was not aware of the circumstances making it desirable to provide for some compensation to the financial institution if the loan were not taken. The evidence shows that the sum bears a reasonable relationship to the expenses and damages the lender would incur. In the exercise of its business judgment the applicant-assignor accepted the terms offered by the financial institution. There is sufficient evidence of agreement.

*Lowe,* 127 Cal. Rptr. at 34-35 (other citation omitted).

This Court is in agreement with the *Lowe* court, that in order for a liquidated damages provision to be permissible, it must bear a reasonable relationship to the prospective damages of a breach and acceptance of the provision must be the product of an arms length business judgment. The Commercial Lease Agreement states that overdue payments will be charged a late fee at a "rate of ten percent (10%) of each past due payment or the maximum permitted by law." *Commercial Lease Agreement*, ¶ 13. Blackstone states that this provision was included to permit compounded late fees, or late fees charged on the overdue principal balance each month. *Blackstone Br.*, pp. 42-

43.  Palomar argues that this provision provides for a one-time late fee charge of ten percent on an overdue payment.  *Palomar Br.*, pp. 44-47.

Here, while the Court would ordinarily accept Palomar's understanding in light of the language of the Commercial Lease Agreement, the parties are at an impasse as to a material fact on this issue, namely the intent of the late charges provision.  In addition, Blackstone has offered scant evidence to show that the late charges provision bears a "reasonable relationship to the expenses and damages [that it] would incur."  *Lowe,* 127 Cal. Rptr. at 34.  Thus, it is possible that any late charge is improper under these circumstances.  Finally, a court may not decide an issue of contract interpretation as a matter of law on summary judgment unless the contract language in dispute is subject to only one reasonable interpretation.  *See Emerson Radio Corp. v. Orion Sales, Inc.*,  253 F.3d 159, 163-64 (3d Cir. 2001) (citations omitted); *CitiSteel USA, Inc. v. Gen. Elec. Co.*, 78 Fed. Appx. 832, 835-36 (3d Cir. 2003) (citing *see also Emerson Radio*,  253 F.3d at 164) (other citation omitted); *Rio Props. v. Armstrong Hirsch Jackoway Tyerman & Wertheimer*, 94 Fed. Appx. 519, 521-*22 (9th Cir. 2004) (citing *see Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 898 (9th Cir. 1993); *Horsemen's Benevolent & Protective Ass'n v. Valley Racing Ass'n*, 6 Cal. Rptr. 2d 698, 710 (Cal. Ct. App. 1992)).  The language of the Commercial Lease Agreement can reasonably be read to support both interpretations.  Therefore, this Court can make no determination as to the late charges provision of the Commercial Lease Agreement and summary judgment as to this issue is denied. Blackstone will have the burden of proof on this issue going forward.

**F. Future Taxes Under the Commercial Lease Agreement**

In computing the amount owed to Blackstone as of April 7, 2006, Mr. Quigley's affidavit includes future sales tax of $27,461.92,[12] discounted to present value at a rate of 6%, for a total of $25,814.20.  *Quigley Aff.*, ¶ 15.  However, Palomar disputes that these taxes have been paid, or are due and owing to Blackstone.  Therefore, this Court cannot decide the issue of future taxes at this juncture and Blackstone has the burden of proof going forward on this issue.

**G. Force Place Insurance Under the Commercial Lease Agreement**

In computing the amount owed to Blackstone as of April 7, 2006, Mr. Quigley's affidavit includes delinquent insurance payments of $8,470.  *Id.*  Blackstone alleges that at some undefined point in time, it was required to force place insurance on the water bottling equipment, due to CCW's failure to do so as required by the Commercial Lease Agreement.  However, as Palomar points out, Blackstone cannot recover alleged delinquent insurance payments, having failed to produce evidence of the existence and cost of a replacement insurance policy.  *See Anderson*, 477 U.S. at 248-50; *Celotex Corp.*, 477 U.S. 322-23.  As a result, summary judgment in favor of Palomar is granted as to this element of Blackstone's claim.

**H. The Amount of Principal and Interest Under the Commercial Lease Agreement**

Before this Court, Palomar and Blackstone agreed that: (i) the amount of principal initially tendered to CCW to finance the purchase of the water bottling equipment, and (ii) the interest rate embedded in the Commercial Lease Agreement payments are both genuine issues of material fact.

---

[12] Blackstone's Payoff Demand, effective February 7, 2006, lists future sales tax, discounted to present value at

*Oral Argument on Motions for Summary Judgment.*  Therefore, this Court will not address either of these issues.

## I. The Implications of Robert Ferb, Esq.'s Involvement

On its cross-motion Blackstone seeks an "Order granting [it] summary judgment dismissing [CCW's] complaint and awarding Blackstone its full balance due, plus late charges, other charges and attorneys' fees."  *Blackstone's Notice of Cross-Motion for Summary Judgment.*  In addition to its opposition to Palomar's arguments and its own arguments in favor of summary judgment, Blackstone argues that Mr. Ferb's continuous involvement during the negotiation of the Commercial Lease Agreement, as Mr. Phillips's counsel, bars summary judgment in favor of Palomar on all issues raised.  *Blackstone Br.*, p. 16.  In response, and in support of Palomar's reply memorandum of law, Mr. Ferb states that his involvement was limited to review of the proposed agreements, and that he "had no role in the negotiations between CCW and Blackstone regarding the Blackstone funding which took place prior to approximately mid-May 2004."  *Ferb Aff.*, ¶¶ 5-6.

The dispute regarding the scope, extent, and timing of Mr. Ferb's involvement in the negotiation, review, and execution of the Commercial Lease Agreement is a genuine issue of material fact.  It forms the basis for Blackstone's claim that Mr. Phillips's continuous legal representation is sufficient to grant its cross-motion for summary judgment as to all issues raised by Palomar and to deny Palomar's motion for summary judgment.  Therefore, this aspect of Blackstone's cross-motion must be denied.

---

6%, as $29,040.98.

### J. Attorneys Fees Under the Commercial Lease Agreement

"[S]tate law governs an award of attorney fees if 'state law and not federal bankruptcy law

provides the rule of decision in a contested matter.'"  *Krommenhoek v. A-Mark Precious Metals, Inc.*

(*In re Bybee*), 945 F.2d 309, 315-16 (9th Cir. 1991)  (quoting *Holiday Mobile Home Resorts v.*

*Wood* (*In re Holiday Mobile Home Resorts*), 803 F.2d 977, 979 (9th Cir. 1986) (applying Arizona

doctrine of *res judicata* to petitioner's motion to reopen bankruptcy); citing *Merced Prod. Credit*

*Ass'n v. Sparkman* (*In re Sparkman*), 703 F.2d 1097, 1099 (9th Cir. 1983) (applying state contract

and tort law raised by debtor-in-bankruptcy's counterclaims against claimant)).  Section 1717 of the

California Civil Code governs the recovery of attorneys' fees provided by an express contractual

provision and controls *sub judice*.  *See Heritage Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 442-

*43 (9th Cir. 1997) (quoting *Milman v. Shukhat*, 27 Cal. Rptr. 2d 526, 529 (Cal. Ct. App. 1994)).

Section 1717 of the California Civil Code "'was enacted to establish mutuality of remedy

where a contractual provision makes recovery of attorney's fees available for only one party, and to

prevent oppressive use of one-sided attorney's fees provisions.'"  *Lewis v. Alpha Beta Co.*, 189 Cal.

Rptr. 840, 842 (Cal. Ct. App. 1983) (quoting *Reynolds Metals Co. v. Alperson*, 599 P.2d 83, 85 (Cal.

1979)).  The Commercial Lease Agreement provision on attorneys' fees and costs states that "[i]n

the event of a breach, Lessor may recover attorney fees and costs as provided herein."  *Commercial*

*Lease Agreement,* ¶ 1.  Pursuant to Section 1717 of the California Civil Code, *Heritage Ford*, and

*Lewis*, this provision is reciprocal to both Palomar and Blackstone.

In *Melnyk*, the California Court of Appeal affirmed a reduced award of attorneys' fees to

defendant's counsel after the plaintiff challenged their reasonableness via a memorandum of points

and authorities on a motion to tax costs, made in response to defendant's cost memorandum.  *Melnyk*

*v. Robledo*, 134 Cal. Rptr. 602 (Cal. Ct. App. 1976).  "[W]here the items are properly objected to,

they are put in issue, and the burden of proof is upon the party claiming them as costs."  *Id.* at 606

(citing *Oak Grove School Dist. of Santa Clara County v. City Title Ins. Co.*, 32 Cal. Rptr. 288, 298-

99 (Cal. Ct. App. 1963)).

Palomar improperly relies upon *Melnyk* for the proposition that this Court can reduce or

eliminate attorneys' fees and determine their reasonableness on a motion for summary judgment.

*Melnyk* is easily distinguishable from the case at bar.  In *Melnyk*, judgment had been entered in favor

of the defendant prior to any request for fees or costs.  *See Melnyk*, 134 Cal. Rptr. at 604.  In

addition, the decision in *Melnyk* came in response to a motion to tax costs relating to a previously

submitted cost memorandum.  *Id.*  In this bankruptcy proceeding, no final judgment has been entered

in favor of either party with regard to the Commercial Lease Agreement.  In addition, no request for

attorneys' fees is before the Court at this time.  Thus, Palomar's objection as to attorneys' fees is

improper and will not be decided on this motion.


## **CONCLUSION**

For the foregoing reasons this Court finds as follows with respect to Palomar's motion for

summary judgment and Blackstone's cross-motion for summary judgment: (i) the Commercial Lease

Agreement is a secured transaction governed by Article 9 of the California Uniform Commercial

Code; (ii) the water bottling equipment became the property of CCW and S&P Water upon

execution of the Commercial Lease Agreement, subject to the security interest of Blackstone; (iii)

Blackstone is entitled to enforce its security interest pursuant to the remedies provisions in Article 9

of the California Uniform Commercial Code and the Commercial Lease Agreement, subject to any

–47–

legitimate defense raised by CCW as to the enforceability of a specific remedy; (iv) Blackstone's recovery of future rent discounted at 6% is proper under the Commercial Lease Agreement; (v) Blackstone may not recover the cost of replacement insurance; (vi) the Commercial Lease Agreement provision on attorneys' fees and costs is reciprocal; and (vii) the balance of the issues raised in Palomar's motion for summary judgment and Blackstone's cross-motion for summary judgment are denied because of the existence of genuine issues of material fact.

Palomar's motion for summary judgment is hereby granted in part and denied in part, and Blackstone's cross-motion for summary judgment is hereby granted in part and denied in part. An Order in conformance with this Opinion has been entered and a copy is attached hereto.


/s/    *Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: April 3, 2007

–48–